(C.D. 2228)

RT. REV. MSGR. JOHN F. WHEALON v. UNITED STATES

United States Customs Court, Third Division

(Decided January 10, 1961)

*Robert B. Krupansky* for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Sheila N. Ziff,* trial attorney), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges

DONLON, Judge: The merchandise of this litigation consists of 20 stained glass windows that were imported from France to be installed in the Borromeo Seminary at Wickliffe, Ohio. The Seminary is an institution in the Roman Catholic Archdiocese of Cleveland for the training of candidates for the priesthood.

There is a protest assertion that the imported windows were installed in three different rooms, namely, the refectory, the Aula Magna, and the library, all within the Seminary property, but the proofs fail to show that any of the imported windows was installed in the Seminary refectory. The testimony is that 10 of these windows were installed in the Aula Magna and 10 in the library. The claim is that these are houses of worship within the meaning of paragraph 1810 of the Tariff Act of 1930.

Use of stained glass windows in a house of worship is one of the tests for free entry under paragraph 1810. The collector ruled that the Seminary, and, specifically, the Aula Magna and the library of the Seminary, were not houses of worship. Accordingly, the collector classified the importation as stained glass windows, not specially provided for, and charged duty at 30 per centum ad valorem, under paragraph 230(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, effective October 19, 1951, T.D. 52836.

Certain relevant facts are not in dispute. It has been stipulated that the windows are stained glass, that they are works of art, and that the value of the windows is in excess of $15 per square foot. These are conditions for free entry under paragraph 1810. The issue before us for decision is narrowed down to the single question, whether the windows were imported to be used in a house of worship, within the intention of Congress, as expressed in paragraph 1810.

Although the words "houses of worship" in connection with exemption from duty of certain stained glass windows have been included in various tariff acts, beginning with the Tariff Act of 1913, research does not disclose, nor are we cited, any judicial definition of "houses of worship," as those words are used in the tariff sense.

Failing either a precedent or some evidence as to a commercial meaning, and here there is neither, the words are to be given their common meaning. *Armand Schwab & Co., Inc.* v. *United States*, 32 C.C.P.A. (Customs) 129, C.A.D. 296; *United States* v. *Mercantil Distribuidora et al.*, 43 C.C.P.A. (Customs) 111, C.A.D. 617. The common meaning of a tariff term is a matter of law to be determined by the court. *United States* v. *O. Brager-Larsen*, 36 C.C.P.A. (Customs) 1, C.A.D. 388. As Judge Kirkpatrick pointed out recently in *United States* v. *Victoria Gin Co., Inc., et al.*, 48 C.C.P.A. (Customs) 33, C.A.D. 759, decided November 17, 1960, "the interpretation of words of common speech is within the judicial knowledge and matter of law."

"Houses of worship" is a phrase in common speech.

In Funk & Wagnalls New Standard Dictionary (1956), there appear the following definitions:

*house* of God, of prayer, of the Lord, *of worship, any place of worship.*

**worship,** *n.* 1. The act of feeling of adoration or homage toward a deity, especially toward God; the paying of religious reverence and divine honors, such as *adoration, thanksgiving, prayer, praise, and offerings.* [Emphasis supplied.]

A place where acts of worship are paid to a deity, such as adoration, thanksgiving, prayer, praise, or offerings, may be a house of worship. However, we see no reason to conclude that Congress, in enacting paragraph 1810, intended to authorize duty free entry of stained glass windows for privately maintained places of individual worship, or for places primarily devoted to other activities and used for organized group worship only occasionally or irregularly. Examination of the proceedings in Congress and before its committees, over a period of years, all of which are public records, leads us to the view that Congress, in enacting the stained glass window provision of paragraph 1810, intended to permit duty free entry for those stained glass windows (otherwise meeting the terms of the exemption) which were imported to be used in places where organized group worship was a regular use of the premises.

This is not to say that an individual, in the privacy of his home or elsewhere in seclusion, may not worship, that is, pay to God religious reverence and divine honors such as adoration, thanksgiving, prayer, praise, and offerings. There is, however, nothing to suggest that Congress intended that places of private worship were intended to be classed as houses of worship, in the tariff sense.

A house of worship may be the place of worship of any one of many faiths and sects. It is, in our opinion, a place under the control of an established faith or sect where, under the auspices of that faith or sect, groups of persons regularly meet to join in acts of worship usual to the tenets and practices of the faith or sect.

We proceed now to review the evidence of record, testing the protest claim by measuring such evidence against the definition of house of worship, in the tariff sense, at which we have arrived.

We are not persuaded either by the proofs that have been adduced or by the arguments which plaintiff has advanced, that the entire Borromeo Seminary is a "house of worship" in the tariff sense. The Seminary is an institution for professional religious education, in this case, the education of priests. Like theological seminaries of many faiths, its professional education trains those who are to lead others in worship according to the tenets and practices of that faith. The distinguishing function of seminaries is the *education* of rabbis, ministers, priests, or other leaders of worship.

That useful compendium of information, the telephone directory, shows that there are, in Manhattan alone, at least the following such seminaries: Biblical Seminary, General Theological Seminary, Rabbinical Seminary, and St. Vladimir's Orthodox Seminary.

Within a seminary property there may, however, be places that are used chiefly for worship, as distinguished from the chief use of other places in the seminary for education.

In our opinion, a house of worship may be a place, or room, within a building. Churches and chapels, especially in modern architecture, often are part of structures which also house other group activities, such as Sunday school rooms; nurseries for the care of babies and children while parents are attending religious service; meeting rooms for use by church societies and others; reading rooms; parish and staff offices; kitchens and service pantries; and a variety of other accommodations that may be deemed useful as part of, or in support of, the religious program. Some such rooms may be dedicated by chief use to acts of group worship. Others would seem not to be so dedicated. Whether a particular room is a place of worship is to be determined by the facts.

House, in the phrase house of worship, is, of course, not used in the sense that it signifies a dwelling place for a family, nor necessarily that it is a self-contained structure. In our opinion, a house of worship, the phrase before us for construction, may be either the entire building, or a part thereof.

In the sense that house may be, physically, a single room or part of a building, we are cited to no precedents so holding as to houses of worship. There are, however, numerous cases cited in Words and Phrases (vol. 19, Words and Phrases, pp. 684–5) in which a room, office, or apartment was held to be a house in some statutory sense. We need not here repeat the citations. Those cases construed the term "house" as applying to a room, or some part of a structure, in construing such situations as the entry of an office by force, under a criminal statute defining burglary as being the entry of a house by force; maintaining a room for disorderly conduct, as maintaining a disorderly house; a statute giving landlords a lien on the property of tenants in a rented house, as permitting a lien on such property in a rented apartment; keeping a single room for gambling, as keeping a house for gambling; etc., etc.

Probably no one would deny that the Seminary chapel is a house of worship in the tariff sense, even though it is housed within a larger structure. Indeed, defendant seems to concede that the Seminary chapel is a house of worship. Defendant repeatedly refers to the chapel as the place where Mass is said. However, the chapel is not in issue here; nor is worship limited to a single service, as the Mass. Our problem relates to two rooms, one of which is known as the Aula Magna (Great Hall) and the other as the library of the Seminary, and to the evidence of record as to acts of worship for which those rooms are used.

Is either the Aula Magna or the library of the Borromeo Seminary a "house of worship"? The evidence of record as to the purposes for which those two rooms are chiefly used regularly, is that the chief regular use of the Aula Magna is organized worship and that the chief regular use of the library is study. The Aula Magna is used also for nonworship purposes, when not in use for the regularly scheduled worship services. The library is used for individual worship, as well as for study.

Congress did not see fit to grant duty free entry for stained glass windows, works of art, valued at $15 or more per square foot, imported to be used in libraries or other educational institutions. It granted duty free entry for such windows when imported to be used in a house of worship.

Plaintiff, the Very Reverend Monsignor John Francis Whealon, Rector of the Borromeo Seminary, testified that the Seminary property includes several buildings. One of these buildings is set aside for high school classes; it houses a dormitory, a study hall, and a chapel. (R. 6.) Another of the Seminary buildings houses the college classes, a chapel, the library, and also the room known as the Aula Magna, or Great Hall. (R. 19.) It is in the college chapel that Mass is celebrated. The chapel is used also for group prayers and for private prayers. Sermons are regularly preached in the chapel, although sermons are not part of the Mass. (R. 8.)

Photographs of the Aula Magna are in evidence. (Collective exhibit 1, 1(a), (b), (c), (d).) Monsignor Whealon described the Aula Magna as a large rectangular room having fixed seats which accommodate 230 persons. There are two side aisles and a center aisle. The walls are somber in hue, and the windows are stained glass depicting Saints of the Catholic Church, or other religious subjects. (R. 13.) A motto in Latin on each window is addressed to the Saint depicted in the window, invoking prayer and inspiration for the students. (R. 14.) On a raised platform at one end of the hall (R. 10), there is a podium, or lectern. (R. 24.)

The primary purpose of the Aula Magna was stated by Monsignor Whealon, in his testimony, as follows:

The primary purpose of the Aula Magna is to convene the seminarians for regular instructions, and before every instruction a prayer is held by all, together. After the instruction, prayer is held; and the typical instruction concerns morality, or belief, so that it is equivalent to a sermon. [R. 18.]

While the Aula Magna is used also for events other than these regular exercises of prayer with sermon, or instruction, Monsignor Whealon said, on cross-examination:

* * * an auditorium would not have religious subjects portrayed in its windows, or such a restrained atmosphere as the Aula Magna has. [R. 23.]

The secondary uses of the Aula Magna are for student assemblies for nonreligious exercises, such as listening to a visiting lecturer, or for some other program. (R. 11, 24.) The Aula Magna, is, in the Monsignor's opinion, utilized for religious purposes, as defined and accepted in the Catholic faith. (R. 12, 18.)

Mass is not celebrated in the Aula Magna. (R. 24.) However, the ritual of regular public prayer and religious instruction is common both to the Aula Magna and to the chapel. (R. 25.)

As to the library, it is utilized for study and meditation. (R. 19.) Monsignor Whealon gave it as his opinion that this also was a house of worship within the general definition of worship which, according to his training and understanding, involves:

* * * an act by which man shows recognition of his creator; and we should perhaps understand that from the viewpoint of God, that it consists of a preacher of God showing his recognition of his maker through some action; and I believe that we should be careful not to restrict our understanding of worship to that which is characteristic of one religion. Worship may range from the formal type, such as the Catholic Mass, to what perhaps is a less formal type, consisting of a sermon, and public prayers, and hymns, such as is to be found in many Protestant religions. It likewise consists of just thinking, or meditating about God, as I read recently concerning the Quaker religion, so I think any act by which man recognizes God would come under that general category of worship. [R. 22.]

Defendant's argument seems to be that worship, in the Catholic faith, is limited to the celebration of Mass; and that, therefore, there can be no Catholic "house of worship," save the place where the Mass is celebrated. Recurring to the lexicographic definition of worship, earlier cited, we proceed to consider whether the Mass is the only act of "adoration, thanksgiving, prayer, praise, and offerings" included in the rites and services of the Catholic Church.

In "The Externals of the Catholic Church," by Right Reverend Monsignor John F. Sullivan, D.D., a publication revised and updated in 1951 by Reverend John C. O'Leary, Ph. D., and published under the imprimatur of Francis Cardinal Spellman, Archbishop of New York, the foreword refers to the 1951 revision as one needed to bring the work current with new attitudes towards the "official forms of *worship*" of the Catholic Church. [Emphasis supplied.] Included in this book are data relative to the ceremonies of administration of the sacraments and sacramentals, as well as the Mass, and other religious exercises grouped under the chapter title "Devotions." The 7th of 11 subtitles in this chapter is "Our Daily Prayers."

Noting the practices of differing communities of Catholics with respect to special devotions, there is cited, by way of example, one such association, of which several million Americans are members, of which it is said:

The religious duties of the association are a daily offering of prayers and good works, the daily recitation of a decade of the beads for the special intention of the Holy Father, as recommended in the monthly bulletin of the society, and the making of a Communion of Reparation on an assigned day of the month or week. The first Friday of each month is observed as a day of special devotion, the Mass of the Sacred Heart being usually celebrated; and evening services are held at which the members assist. [P. 37.]

We conclude that, in the Catholic faith, there are services of worship other than the Mass, and that these services of worship include prayer services, with sermon, such as are regularly held in the Aula Magna. Indeed, both in the King James (Protestant) and Douay (Catholic) versions of the Bible, our Lord is quoted as authority for what the Douay Bible (American publication) subtitles as "The Power of United Prayer."

> For where two or three are gathered together for
> my sake, there am I in the midst of them.
> Matt. XVIII, 20 [Douay Version].
> For where two or three are gathered together in
> my name, there am I in the midst of them.
> Matt. XVIII, 20 [King James Version].

The Aula Magna is, on occasion and perhaps frequently, used for purposes that are not directly connected with worship. While defendant's argument is that the prayer services and religious instruction regularly held in the Aula Magna either are not worship services or are not the primary use of the Aula Magna, and, therefore, defendant does not consider whether secondary secular uses of the Aula Magna would bar a finding that the Aula Magna is a "house of worship" in the tariff sense, it seems to us necessary to consider also that aspect of the matter. Neither of the briefs cites any case construing the secular use of premises which are regularly used for religious services, but our research discloses that this is not a wholly novel problem.

In *St. Paul's Church* v. *City of Concord*, 75 A. 531 (N.H. 1910), the court had before it a petition for abatement of real property taxes. The New Hampshire statutes provided that "Real estate * * * is liable to be taxed, except houses of public worship." The premises in litigation, owned by St. Paul's Church, an Episcopal congregation, consisted of a two-story brick building with basement, separate from the parish church. In the basement of this separate building, there was a dining room, kitchen, and serving room. On the first floor, there was a coat room; also, a large hall fitted with benches, seating about 250 persons, and with kneeling boards and racks for hymnals and prayer books, a stage equipped with lectern, kneeling stool, and other ecclesiastical furniture; also a drop curtain, and a room off stage, which was used as the vesting room for clergy and as a dressing room for entertainers. On the second floor, there were rooms used for

meetings of parochial organizations and for Sunday school classes, and a choir practice room.

During the year, 40 regular Friday evening prayer services were held in the first floor hall. These were conducted by a clergyman. Sometimes there was a sermon, sometimes not. On about 40 Sunday mornings of the year, the Sunday school of St. Paul's parish was held in the hall, the sessions being preceded by a children's service of prayer, conducted either by a clergyman or by a layman. Parish organizations held their meetings in the building. The second floor was used for both business and social purposes. The hall itself was rented for meetings, dancing parties, lectures, and musical recitals.

Plaintiff claimed that the building was a "house of worship" under the statute. Defendant argued that it was not, because of the secular uses.

The Supreme Court of New Hampshire held that the parish house was a "house of public worship" in the statutory sense, saying:

It must also be assumed that the parish house is suitable in its appointments for such religious purposes as the plaintiff, a religious corporation, seeks to promote in the performance of its corporate functions, and that it is primarily devoted to the worship of the Deity and such incidental exercises as are usually connected with, and deemed directly helpful to, the exercise of religious functions, according to the regulations of the Episcopal Church. There is no suggestion that the plaintiff does not use the building for all such religious exercises as it was devoted to, or that its use of it for such purposes is interfered with, or curtailed, by the fact that it is sometimes, and perhaps frequently, used for entertainments of a nonreligious character. The building subserves all the religious uses for which it was erected, and it is maintained as a house of public worship, so far as the needs and convenience of the church require. Its religious use is not rendered less because of its secular use. The plaintiff's occupation of it for the promotion of religion has not in fact been abandoned or diminished in consequence of its temporary use, at times, for secular entertainments. This seems to be conceded.

    \*        \*        \*        \*        \*        \*        \*

The statute exempting "houses of public worship" was first passed in 1842 \* \* \*, and that expression has been retained in all subsequent revisions. The meaning originally attached to it was not a technical one. It was evidently intended to include such buildings as were then usually and popularly termed "churches" and used for the encouragement of religion and piety, which in the Bill of Rights (article 6) it is declared "will give the best and greatest security to government." Argument is unnecessary to show that the purpose was to promote religious worship, and not to discourage it by limiting the exemption to the very small number of church buildings in the state in which no secular entertainments were permitted. Indeed, it is probable that there were none of that exclusive character. They were used for social, literary, educational, and political gatherings, when not actually occupied for public worship. They accommodated the public in many ways which may be deemed secular, without abridging their use for religious purposes. "In earlier times in this state, and in all the New England states, the church—commonly called the 'meeting house'—was customarily used for town meetings, lectures, concerts, temperance meetings, political addresses, and for other like special occasions; and no one

ever supposed that such use made the meeting house liable to taxation. In the country towns the like use still prevails. In view of such general use, it is not to be supposed that the Legislature intended, by any language it has used, to make all such church buildings taxable." *First Unitarian Society* v. *Hartford*, 66 Conn. 368, 375, 34 Atl. 89, 90. The statute referred to in that case exempted from taxation "buildings exclusively occupied as churches," and the court declined to carry the doctrine of exclusiveness to the extent of defeating the general legislative purpose.

* * * If the house serves all the religious purposes for which it was designed, and is not appropriated to other uses in the sense of a substantial exclusion of the religious use from any part of it, no reason is apparent why it does not promote all the uses which the Legislature had in mind when it was exempted as a house of public worship. In this view, it is exclusively used as such a house. So long as the church organization occupies it for such public services of a religious character as it deems useful and desirable and as the building is adapted to subserve, to the exclusion of all secular uses, it is used exclusively as a house of public worship. When it is not required or needed for religious services, and when its use for other purposes would not curtail or interfere with the full and free accomplishment of its original and essential design, its remaining unoccupied and useless would not seem to be a necessary requisite for its exemption from taxation. If at such times it is used for some innocent entertainment of a secular nature, would it be reasonable to hold that it thereby lost its exclusively religious character? Is there any evidence that such was the intention of the Legislature? We fail to discover it. [Pp. 532–3.]

The *St. Paul's* case was construing, in terms of a statute exempting from real property taxes, the expression "houses of public worship" and we are here construing, in terms of a statute exempting from customs duties, the expression "houses of worship." However, we deem the situations analogous and the precedent helpful. There, as here, the hall was used regularly for worship services (prayer with sermon, or religious instruction) and, when not so used, was available, and frequently used, for secular purposes. There, as here, the hall was separate from the church or chapel, and was part of a building some of which was never used for worship services.

We have no doubt that Congress intended to include within the expression "houses of worship" not only those edifices that are usually called "churches," which are of course "houses of worship," but also other places the primary use of which is for holding regular worship services of a faith or sect. The Aula Magna is such a place.

Moreover, if there were any fair doubt as to the true construction of paragraph 1810 in this respect, the statute should be liberally construed. *Benziger* v. *United States*, 192 U.S. 38, cited with approval in the recent court of appeals decision, *United States* v. *St. Joseph's Church*, 48 C.C.P.A. (Customs) 42, C.A.D. 761, decided December 8, 1960.

Mention should be made of *Perry, Ryer & Co.* v. *United States*, 6 Ct. Cust. Appls. 201, T.D. 35462, cited by defendant *in extenso*. Defendant argues that the court, in its opinion in that case, noted that, in the Tariff Act of 1913, Congress changed the tariff status of stained

glass windows when imported to be used in houses of worship, "by substituting the word 'including' for the word 'except' * * *." Defendant further argues that the *Perry, Ryer* decision, referring as it did to language in hearings before congressional committees relative to "restoring the privilege of free entry" to church windows, is tantamount to judicial construction that Congress intended the phrase "house of worship" to be synonymous with "church" and that subsequent tariff acts constitute legislative acceptance of this judicial construction in the *Perry, Ryer* case.

What was the *Perry, Ryer* decision?

The Board of General Appraisers (*Id.* v. *Id.*, vol. 28, T.D. 35168, p. 276) found that the collector had different reasons for assessment of duty on the stained glass windows of the two importations there before the board.

In one case, the collector had denied free entry on the ground, *inter alia*, that "no evidence was furnished of the incorporation of the church for which these windows were imported * * *." The board held, and the court of appeals affirmed, that free entry is not dependent on incorporation.

That left in issue, in both cases, *the method of construction* of the windows. The collecter contended that notwithstanding the duty free provision for certain windows imported to be used in houses of worship, there was also in the same tariff paragraph (655) of the 1913 act an exclusion from the free entry privilege of "any article, in whole or in part, molded, cast, or mechanically wrought from metal within twenty years prior to importation; * * *."

The Board of General Appraisers decided, on the evidence of record, that the windows in litigation were, in part, at least, molded, cast, or mechanically wrought; that the sash were of lead, cast into bars, and then drawn into strips by machinery; and that, therefore, "the windows come within the prohibition found in paragraph 655" of the Tariff Act of 1913, and so were not entitled to free entry.

The court of appeals reversed this decision, ruling that the two provisions of paragraph 655, for windows imported to be used in houses of worship and for windows constructed in the described manner, are separable, each complete in itself. The decision of the court of appeals is well summarized in the final paragraph of the opinion, as follows:

Viewing that portion of paragraph 655 relating to painted or stained glass windows as a complete, independent provision in nowise affected or modified by the last provision of the paragraph, the question as to whether or not unincorporated institutions are entitled to its benefits is not in the case. It affords its own designation of beneficiaries, extending to all houses of worship. For these reasons we are of the opinion that the importations were entitled to free entry and that the decision of the Board of General Appraisers should be *reversed*. [Italics quoted.]  [P. 206.]

It may further be observed, in considering the argument defendant advances as to judicial construction of "house of worship" as being limited to "church," that neither expression was used in any prior tariff act, so far as research discloses, and that it was "houses of worship" and not "churches" which Congress specified in the 1913 act and has regularly specified in subsequent tariff acts.

The theory defendant invokes, with respect to the *Perry, Ryer* case, is that reenactment by Congress of legislative language subsequent to judicial decision construing the language, constitutes legislative acceptance of the judicial determination. It is unnecessary to cite authorities in support of this recognized legal principle.

What is necessary is to distinguish between legislative acceptance of a judicial *decision* and legislative acceptance of *obiter dicta*.

In 3 Customs Law Digest 87, there is cited the following, on the subject of *obiter dicta*:

General expressions in court's opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case they ought not to control judgment in a subsequent suit when the very point is presented. A part of an opinion which is not needful to the ascertainment of the right or title in question between the parties is not binding.

We know of no authority for the proposition that Congress, or any other legislative body, is deemed by subsequent reenactment of language to have accepted *obiter dicta*, as distinguished from acceptance of what the court held.

In the *Perry, Ryer* case, the court held that to come within the "houses of worship" exemption, incorporation was not necessary; and the court also held that the "houses of worship" provision and the molded construction provision of paragraph 655 were each a complete and independent provision, so that windows otherwise meeting the terms of duty free entry because imported to be used in houses of worship were not to be made dutiable because they were of molded construction. Those are the holdings of the *Perry, Ryer* case, which Congress may properly be deemed to have accepted by subsequent reenactment of the provisions of paragraph 655, now paragraph 1810 of the Tariff Act of 1930. Neither of those holdings is in issue here.

As observed earlier, the courts have not previously been called on to construe what Congress meant by the phrase "houses of worship." That has not heretofore been an issue in litigation. It was not an issue in the *Perry, Ryer* case, and so was not there judicially construed. It is an issue here.

Plaintiff's protest is sustained as to the 10 windows imported to be used in the Aula Magna. In all other respects and as to all other merchandise, the protest is overruled.

Judgment will be entered accordingly.